388 P.2d 982

F. H. BELTS and E. Jean Belts, Husband and wife, and George F. Denham and Eva H. Denham, Husband and wife, Plaintiffs-Appellants,

v.

The STATE of Idaho on relation of the DEPARTMENT OF HIGHWAYS of the State of Idaho, and Roscoe C. Rich, Wallace C. Burns, and Ernest F. Gaffney, Idaho Board of Highway Directors, Defendants-Respondents.

No. 9257.

Supreme Court of Idaho.

Jan. 31, 1964.

Clements & Clements, Lewiston, for appellants.

Faber H. Tway, Chief Legal Counsel, and Anton Hohler, Legal Counsel, Dept. of Highways, Boise, for respondents.

SMITH, Justice.

This appeal is from a judgment of the district court of Nez Perce County denying the claim of appellants (plaintiffs) for specific performance and damages occasioned by the alleged breach of a highway right of way contract by respondent (defendant) Department of Highways. The appeal questions the district court's findings of fact and conclusions of law, thus necessitating a review of the trial record in order to determine whether the evidence is sufficient to sustain the findings and judgment.

On June 7, 1956, appellants, Francis H. and E. Jean Belts, contracted for the sale of approximately 190 acres of their ranch lands to respondents for right of way purposes on a proposed highway project in Nez Perce County. Respondents paid appellants $10,145.80 as the total consideration; $7,195.80 was allocated as the purchase price of the land; and $2,950.00 as damages for (1) rearrangement of appellants' buildings and fences outside of the right of way, (2) clearing and building of cattle trails outside of the right of way for purposes of access

to all various parts of appellants' ranch, (3) loss of direct access to canyon and creek bottoms at all points for cattle and logging operations, and (4) necessary development of springs wherever access to the creek would be obliterated.

The obligations assumed by respondents which appellants claim were not performed satisfactorily appear in the contract as follows:

"Fence both sides of approach to creek crossing at Station 560+00 to allow cattle free access across R/W through 132 inch culvert. Bottom of culvert to be paved to protect feet of cattle. Grantor is hereby granted permission to erect gates at the R/W lines across the approaches to the above creek crossing.

"The fencing on the Westerly (left) side of the R/W shall be completed before the removal of the existing fences and due care shall be taken that during operations the cattle of the grantor will be protected.

"Construct logging and cattle truck approaches at the following locations and will place Type 1 gates at the said approaches:

"353+50 on left—415+00 on left—436+50 on left—515+00 on left—542+30 on left—572+00 on left (access to pump house). All the above approaches to be 24 ft. wide.

"Construct Farm and Home approaches at the following locations and will place 24 ft. Type 2 gates at the said approaches. Said approaches to be 24 ft. wide. 565+75—approximate—to enter grantors property at right of 569+00. Said approach to be wyed after leaving Highway to give access to barn at right of 562+50.

"574+75—approximate—to enter grantors property at right of 571+00. The exact location of the above Farm & Home approaches to be decided by the Resident Engineer, taking into consideration grade and construction features."

Appellants sought damages and specific performance, claiming that respondents breached the contract in that they (1) "neglected to perform * * * the construction of a culvert and the paving of the flooring thereof to protect the feet of plaintiffs' cattle"; (2) "failed to construct the logging and cattle truck approaches and the farm and home approaches in the manner and at the places designated in said Right-of-Way contract to be constructed and installed"; and (3) "removed the fences existing at the time of the contract prior to the installation of the permanent fences, and otherwise failed to protect the cattle operations of the plaintiffs." The trial court found and concluded that those contentions were without merit, and rendered

judgment denying any relief to appellants; this appeal resulted.

Appellants, including George F. and Eva H. Denham as successors in interest to Mr. and Mrs. Belts, assign as error the trial court's failure to find that respondents breached that part of the contract providing for the completion of fence construction on the westerly side of the right of way before removal of the existing fences. Respondents admit their obligation to perform, but contend that such provision of the contract was subsequently modified by an oral agreement, which they approved, between appellants Belts and S. S. Mullan Corporation, the prime contractor on the highway project; and that any duties originally owed for proper completion of the fencing were thereby ended.

Although the trial court made no specific finding as to that alleged breach of the contract, the evidence, while conflicting in some aspects, is sufficient to show that any loss suffered by appellants through inability to use their property for pasturing was brought about by appellants' subsequent agreement with the prime contractor for removal and salvage of the existing fences for use elsewhere on appellants' property. The following supports such conclusion: Direct examination by Donald L. Cox, respondents' engineer in charge of the project:

"Q. In relation to the removal of existing fences and the construction of new fencing along Mr. Belts' property on this project, did you have any discussion with Mr. Belts?

"A. Yes, I had several. * * * The first discussion was shortly after the contract had been awarded in the winter of '57 and '58 and Mr. Belts and Mrs. Belts stopped me in the canyon one day and wanted to know if it would be possible that they would remove the fence on their property so that they could salvage it and use it in other places.

* * *

"Q. What did you tell Mr. and Mrs. Belts?

"A. I told them that according to their contract and our contract * * * that is stated in there that this fence couldn't be removed until the other fence was put up and the state couldn't be a party to this. However, if they could make an agreement with S. S. Mullan, * * * the state would have no objection if they could make a satisfactory agreement so that they could remove the fence and Mr. Mullan would put the other up.

"Q. In other words, you referred them to * * * the construction contractor?

"A. That is right.

"Q. Did you discuss this situation with them at any time after this?

"A. A few days later they told me that they had talked to Mr. Clatterboss who was the project manager of this contract for S. S. Mullan and he had stated that they could take the fence down and at any time that * * * they would ask him he would put this other fence up. At the present time there seemed to be no need for the right of way fence to be up.

"Q. Then did you have any further discussion with Mr. and Mrs. Belts regarding their fencing problem?

"A. Well, it was the following summer or fall they came to me and said that they wanted this fence up and that Mr. Clatterboss hadn't gotten it up yet and they wanted to know what my advice would be * * *. They stated they had been to see him many, many times and I informed them as they had this agreement with them, I would suggest that they take it to their lawyer and let him start action.

"Q. Then after this conversation, did you receive a copy of a letter from their attorney?

"A. I did.

"Q. By this it indicated to you that they had followed your advice?

"A. That is right."

Cross examination of appellant, F. H. Belts:

"Q. * * * Did you remove any of the existing fence yourself?

"A. Yes, I did a small portion of it.

"Q. What do you mean by a small portion?

"A. Well, it was woven wire, about a eighth of a mile of woven fence.

"Q. And you removed that yourself in order to salvage the wire, is that correct?

"A. (no response)

"Q. Did you discuss this with any employee of the State, with Mr. Cox, for instance?

* * *

"A. Yes, I did with Don Cox I am quite sure.

* * * * * *

"Q. Did Mr. Cox tell you that it was the contractor's problem, to talk to the contractor about this?

"A. Well, the contractor talked to me about it.

* * * * * *

"Q. When you discussed this problem with the law firm of Blake & Givens, did they give you a copy of a letter they wrote to Mr. Clatterboss?

"A. Yes, they did.

**550**

* * * * * *

"Q. And it was referring to this fencing problem and a claim that you had against the contractor at that time for not going through with his agreement as per your agreement with Mr. Clatterboss, is that correct?

"A. Yes."

■ Parties to a written contract may modify its terms by subsequent oral agreement, or may contract further with respect to its subject matter. Ore-Ida Potato Products, Inc. v. Larsen, 83 Idaho 290, 362 P.2d 384 (1961); Idaho Gold Dredging Corp. v. Boise Payette Lumber Co., 62 Idaho 683, 115 P.2d 401 (1941); Smith v. Washburn-Wilson Seed Co., 54 Idaho 659, 34 P.2d 969 (1934); Brooks v. Beach, 50 Idaho 185, 294 P. 505 (1930); 6 Corbin on Contracts, § 1316 (1962); Simpson on Contracts, § 63 (1954); Restatement of Contracts, § 407 (1933).

■ There is no evidence to indicate that respondents did not intend to comply with the original contract provision for installation of fences; but by the subsequent agreement, appellants chose to look to Mullan Corporation, and not to respondents, for performance of the covenant relating to the fences. Appellants, themselves, must have entertained such view when they made claim against Mullan Corporation for its failure to construct the fence.

■ Appellants assign as error the trial court's failure to find that appellants suffered damage because of respondents' construction of a concrete bridge at station 560+00, rather than a 132 inch culvert with paved flooring, as called for by the contract. Although respondents argue to the contrary, the contract calls for the construction of a culvert with a paved floor as a means of affording appellants' cattle safe access across the creek. Regardless of size and cost, the construction of a bridge in lieu of the culvert constituted a violation of the contract terms which may be justified if respondents can show that they acted in good faith in attempting to comply with the contract, and that substantial performance took place in the respect that access across the creek was equally or better accomplished by a bridge rather than a culvert. For building contract cases employing the "good faith-substantial performance" test, see Mackey v. Eva, 80 Idaho 260, 328 P.2d 66 (1958); Shell v. Schmidt, 164 Cal.App.2d 350, 330 P.2d 817, 76 A.L.R. 2d 792 (1958), cert. denied, 359 U.S. 959, 79 S.Ct. 799, 3 L.Ed.2d 766 (1959); Martin v. Karsh, 142 Cal.App.2d 468, 298 P.2d 635 (1956). That respondents acted in good faith and provided equal or better access across the creek by means of a bridge is sustained by the evidence. Donald L. Cox, respondents' engineer, testified:

"Q. Do you know why the bridge was substituted for the culvert?

"A. Yes, hydraulic studies showed that the culvert—all available culverts at that time of the multiplate size weren't adequate to carry this stream during high water at this point in the canyon. The slopes are flat at this point and the stream during flood stages is very large.

"Q. Have you had experience with culverts of this type in highway construction under similar circumstances?

"A. Yes, sir.

"Q. Were there other culverts installed in this project, pipe culverts?

"A. Of this type there were—in the very upper end of the canyon there were some culverts of this size on steep grades and in the upper reaches of the creek and then there were some twelve foot culverts installed below that and then there were some nine six by fifteen four multiplate culverts installed. These are all above. The creek is probably about half that size, Rock Creek. Everything below Rock Creek was bridges due to the amount of water that is expected there in flood stage.

"Q. And because of the fact that the eleven foot culvert wouldn't handle the water?

"A. It doesn't handle the water, no.

"Q. Now * * * comparing the eleven foot culvert with the bridge that presently exists at station 560 and referring to the maintenance or the removal of debris and rock that washes in everytime there is high water, which of those two structures are the easiest to maintain?

"A. A bridge would be much easier because you get your equipment under the bridge to move out the rocks that are necessarily going to move in the creek and be deposited at various points in high water.

"Q. Which structure, the culvert or the bridge, would be more apt to plug up or collect rocks and debris?

"A. The culvert of this size in this location would probably completely plug during maximum storms. If it did, why it would wash out the road and flood, damage the surrounding lands."

■ Although appellant Belts disagreed with respondents' contention that access across the creek would be better accomplished through use of a bridge rather than a culvert, the weight and effect to be given the expert testimony of respondents' engineer is for the trier of the facts. The evidence thus adduced was substantial and competent. Findings of the trier of facts, when supported by substantial and competent though conflicting evidence must be up-

held. Smith v. Big Lost River Irrigation District, 83 Idaho 374, 364 P.2d 146 (1961); Jensen v. Boise-Kuna Irr. Dist., 75 Idaho 133, 269 P.2d 755, (1954).

■■ The statement of the engineer, to the effect that a culvert, if constructed, would probably plug up completely during heavy storms, wash out the highway and flood the surrounding lands, also demonstrates that respondents had uppermost in mind the best interests of appellants as well as the general public, when they subsequently decided to and did construct a concrete bridge at a considerably greater cost, than the culvert as called for by the contract. The Department of Highways, in the exercise of its powers and duties with respect to the state highway system, acts as an agent of the state and is under a duty at all times to act in the public interest when performing its duties. Villages of Eden & Hazelton v. Idaho Bd. of Hwy. Dir., 83 Idaho 554, 367 P.2d 294 (1961); State ex rel. Rich v. Idaho Power Company, 81 Idaho 487, 346 P.2d 596 (1959). Respondents' breach of the contract, in constructing the bridge instead of installing the culvert, appears to have been justified under the circumstances. Appellants, having been paid damages for "loss of direct access to canyon and creek bottom at all points for cattle and logging operations", do not show compensatory damage through construction of a bridge rather than a culvert. The trial court was correct in disallowing such claim.

Appellants seek damages, or in the alternative specific performance, on account of respondents' alleged failure "to construct the logging and cattle truck approaches and the farm and home approaches in the manner and at the places designated in said Right-of-Way Contract * * *."

■ Appellant's contention that the farm and home approaches were not constructed in a proper manner or at the prescribed locations is without merit. Appellant Belts, on direct examination, testified:

"Q. * * * Now what was the situation so far as your operations were concerned with regard to the approaches that were to be built by the state under the right-of-way * * *. Let's take the approach called for in the contract by your farm and home there which would be on the station— according to the contract of about 565. Now what was done there?

"A. Was that at the buildings?

"Q. Yes. That is the farm and home approach.

"A. They put in good approaches right there.

\* \* \* \* \* \*

"Q. And the approach that they put in there, were you able to utilize that for all of your vehicular traveling and so forth?

"A. Right at the home, yes. Right there at the home buildings."

Appellants' contentions that respondents did not properly construct logging and cattle truck approaches, and that the trial court erred in finding that appellant Belts approved the location and manner of construction of these approaches, are meritorious. The evidence does not show approval by either Mr. or Mrs. Belts of the way in which the approaches were built and located, but, on the contrary, indicates a conflict in the testimony as to what transpired during conversations between appellant Belts and respondents' engineer, Donald E. Aldridge.

Appellant Belts testified that roads utilized for timber operations prior to respondents' construction of the highway could not be used for that purpose afterwards. The trial court's statement that a logging operation was carried on during the construction project is not decisive of the issue, since appellant Denham testified that the small amount of logging actually then done was accomplished through use of an approach belonging to an adjoining landowner and that further timber operations would be impossible since the approaches built by respondents "would wash out the first time high water would come down."

The evidence shows that at none of the logging and cattle truck approaches constructed under the contract is it possible to travel by vehicle from the highway to appellants' property line. The parties intended such continuity of passage, since gates were installed in the right of way fence to provide trucks with entrance to and from the property line. Such is shown by the testimony of respondents' engineer, Mr. Cox, as follows:

"Q. Mr. Cox, at every one of these approaches I believe that you have testified to, you get off the highway and then from there to the edge of the right of way you cannot get to the property line, is that correct, at the present time?

"A. With vehicles. That is right.

"Q. Now also, as a part of the contract provisions and what was specified in this contract was that each right of way was also serviced and the state had an obligation to put in a 24 foot gate at the property line adjacent to each station to which there was a right of way put in these plans and specifications, is that correct?

"A. That is correct.

"Q. In other words, there had to be some continuity for the vehicle that

came off the highway then to enter into the premises that were on the owners property that abutted the state right of way, is that correct?

"A. There would have been an access from the property owners to the right of way.

"Q. That is true in order to use that approach?

"A. That is right.

"Q. And that is why those gates were put in by the state?

"A. (nodded)."

■ We agree with the standard, adopted by both parties to this action, that what is to be regarded as a satisfactory approach depends largely upon the demands of the traveling public and what would be reasonable under the circumstances and local situation in each particular case. State ex rel. Knight v. Hanway, 136 W.Va. 219, 67 S.E.2d 1 (1951); State ex rel. Washington Toll Bridge Authority v. Yelle, 197 Wash. 110, 84 P.2d 688 (1938); State v. Illinois Cent. R. Co., 246 Ill. 188, 92 N.E. 814 (1910).

It is incumbent upon respondents to improve the logging and cattle truck approaches in accordance with the agreement of the parties, in order that appellants may carry on their timber and cattle operations.

As developed by the testimony, station 437+50 does not require any creek crossing and can be made operational to appellants' property line by leveling and grading. This, respondents must also do, in addition to improving the other approaches in order to perform their obligations in the premises under the contract.

■ Appellants are not entitled to compensatory damages for loss of anticipated profits, since they have failed to show with reasonable certainty what those losses were. Williams v. Bone, 74 Idaho 185, 259 P.2d 810 (1953); Harrington v. Hadden, 69 Idaho 22, 202 P.2d 236 (1949).

The judgment of the trial court is modified and the cause remanded with instructions to direct specific performance of the covenant to which respondents agreed, to construct the logging and cattle truck approaches; or in the alternative, in the event of respondents' failure so to perform, to assess damages therefor in favor of appellants, and to cause such further proceeding to be undertaken consonant herewith, including the taking of testimony, as may be deemed requisite. In all other respects the judgment is affirmed.

Costs to appellants.

KNUDSON, C. J., and McQUADE, McFADDEN, and TAYLOR, JJ., concur.